**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| SAPPHIRE CROSSING LLC, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Civil Action No. 18-1717-MN-CJB (Lead) |
| QUOTIENT TECHNOLOGY INC., | ) ) ) |
| Defendant. | ) ) ) ) |

## REPORT AND RECOMMENDATION

Presently before the Court in these consolidated patent infringement cases are six motions

(the "motions") filed pursuant to Federal Rule of Civil Procedure 12(b)(6) by Defendants

Quotient Technology Inc. ("Quotient"); Intuit Inc.; HealthEquity, Inc.; WEX Health, Inc.; Xero,

Inc.; and Visa Inc. (collectively "Defendants") seeking to dismiss Plaintiff Sapphire Crossing

LLC's ("Plaintiff") claims of patent infringement for failure to state a claim upon which relief

can be granted.[1]  According to Defendants, asserted U.S. Patent No. 6,891,633 ("the '633 patent"

---

[1]      The six motions are found at D.I. 6 in Civil Action No. 18-1717-MN-CJB, D.I. 8 in Civil Action No. 18-1856-MN-CJB, D.I. 10 in Civil Action No. 18-2072-MN-CJB, D.I. 10 in Civil Action No. 18-2074-MN-CJB, D.I. 10 in Civil Action No. 18-2075-MN-CJB and D.I. 10 in Civil Action No. 18-2076-MN-CJB.  Pursuant to a joint motion filed by the respective parties on April 8, 2019 and granted by the Court thereafter, these six cases have all been consolidated for pre-trial purposes, with Civil Action No. 18-1717-MN-CJB being designated as the lead case. (Civil Action No. 18-1717-MN-CJB, D.I. 23)  For this reason, and unless otherwise noted below, the Court will refer to these cases as "this case" or "the case" and will cite only to documents filed in the lead case.

As the cases are now consolidated, this Report and Recommendation will be filed in the lead case only (Civil Action No. 18-1717-MN-CJB) but will serve to resolve all of these pending motions.  Additionally, although Defendants each filed separate briefing with regard to the motions, the content of that briefing is very similar, and Defendants have confirmed that the Court can rely on the content of Defendant Quotient's briefing in assessing the collective arguments of Defendants.  (D.I. 46 at 33-34)  As a result, below, the Court will cite only to that briefing and will describe it as conveying "Defendants'" collective positions, unless otherwise noted.

or "the asserted patent") is directed to ineligible subject matter under 35 U.S.C. § 101 ("Section 101"). For the reasons set out below, the Court recommends that the motions be GRANTED without prejudice.

## I. BACKGROUND

### A. Procedural History

This is a patent case filed by Plaintiff against the respective Defendants between October 31, 2018 and December 28, 2018, in which Plaintiff alleges that those Defendants infringe the '633 patent. (D.I. 1; Civil Action No. 18-1856, D.I. 1; Civil Action No. 18-2072, D.I. 1; Civil Action No. 18-2074, D.I. 1; Civil Action No. 18-2075, D.I. 1; Civil Action No. 18-2076, D.I. 1) Judge Maryellen Noreika thereafter referred the case to the Court to hear and resolve all pretrial matters, up to and including expert discovery matters. (D.I. 12)

Between December 26, 2018 and February 27, 2019, Defendants filed their respective motions, each seeking to dismiss the respective Complaints filed against them on Section 101 grounds. (D.I. 6; Civil Action No. 18-1856, D.I. 8; Civil Action No. 18-2072, D.I. 10; Civil Action No. 18-2074, D.I. 10; Civil Action No. 18-2075, D.I. 10; Civil Action No. 18-2076, D.I. 10) Standard briefing on the motions was completed by April 26, 2019. (D.I. 33; D.I. 34; D.I. 35; D.I. 36) Pursuant to an order of the Court, the parties also filed short additional letter briefs that further highlighted some basic details about the nature of their Section 101 arguments. (D.I. 20; D.I. 22; D.I. 29; D.I. 38; D.I. 39; D.I. 40; D.I. 41; D.I. 42; Civil Action No. 18-1856, D.I. 25) Defendants also requested oral argument on the motions, (D.I. 37), which the Court granted (D.I. 45). Oral argument was held on June 26, 2019. (D.I. 46 (hereinafter "Tr."))[2]

---

[2]     At the parties' request, the case has been stayed pending resolution of Defendants' motions. (D.I. 44)

## B. The '633 Patent

The '633 patent is entitled "Image Transfer System" and describes an "electronic assembly comprising an image transfer device . . . and a computer." (D.I. 1, ex. A (hereafter "'633 patent") at Abstract) The figures in the patent are hand-drawn, and Figure 1, reproduced below, provides a "schematic diagram of an image transfer system incorporating features of the present invention[,]" ('633 patent, col. 2:40-41):



*FIG. 1*

(*Id.*, FIG. 1 (illustrating "image transfer system **10**," "image transfer device **12**," and "computer **14** []connected to the image transfer device **12** by a cable **36**"); *see also id.*, col. 3:6-18)

The '633 patent explains that "[t]here are examples in the prior art of image transfer systems comprising an image transfer device coupled to one or more computers." (*Id.*, col. 1:12-14) The patent-in-suit cites U.S. Patent No. 5,798,738, entitled "Printing Manager System for a Copier in a Network," as an exemplary prior art system "compris[ing] a terminal connected to a copying machine." (*Id.*, col. 1:14-17) However, the '633 patent criticizes such "copying machines in the prior ar[t,]" explaining that they are "capable of performing only a given set of functions regardless of whether the copying machine is connected to a computer or not." (*Id.*, col. 1:17-20)[3]

The '633 patent goes on to distinguish the present invention from such prior art. It asserts that "[o]ne object of the present invention is to provide a software and user interface (UI) solution for enriching personal and desktop copier feature sets by utilizing the processing power and memory capacity of a connected personal computer ['PC']." (*Id.*, col. 1:21-25) Indeed, the '633 patent repeatedly touts this borrowing of a connected computer's processing power and memory as a key inventive contribution of the patent. (*See, e.g., id.*, col. 14:1-12 ("The present invention provides a stand alone image transfer device equipped with minimal memory and processing capabilities to perform basic image transfer operations, which when connected to a computer such as a PC, can be quickly expanded to have an extended number of advanced function[s] which generally are not available in an image transfer device of that size."); *see also id.*, cols. 14:42-48, 15:1-9, 15:20-41) The patent also notes that another object of the present

---

[3]       The patent-in-suit explains that in the relevant timeframe, the "cost of memory" for prior art devices was "significant[,]" and so in order to reduce cost, such devices were made to have smaller "internal memory size[.]" ('633 patent, col. 15:20-30) This, however, had the effect of "limit[ing] the capabilities of the[se] low cost devices to [allow them to] perform[] only basic functions such as mere copying or faxing without any enhancement." (*Id.*)

invention is to "provide[] for initiation of the job to take place at the device, so the user need not know the PC is involved in the process." (*Id.*, col. 1:31-34)

In several of the embodiments described in the '633 patent, a document/image is first scanned at the image transfer device (also called a "multifunction device"). (*Id.*, cols. 1:25-29, 15:1-9) The scanned data is then sent to the connected computer to leverage that computer's processing power, in order to perform "enriched" functions (e.g., "collation" or adding a "fixed message" to the document); thereafter, the enhanced document is sent back to the image transfer device for "output" or "printing on [a] sheet medium[.]" (*Id.*, cols. 1:21-31, 2:4-16, 13:16-67, 14:13-15:19)

In another embodiment (one particularly relevant to the discussion below), "data used to effect image transfer . . . according to the enhanced menu features" is stored in the connected computer's memory 34A. (*Id.*, col. 11:40-43; *see also id.*, cols. 11:44-12:17, FIG. 9) "[S]uch data may include bitmaps representing time and date stamps, fixed messages, logos or watermarks to [be] added to the images as well as the coordinates for printing the bitmaps[.]" (*Id.*, col. 11:43-46) Unlike other described embodiments that leverage the attached computer's processor 32C to perform extended features, in this embodiment, the central processing unit ("CPU") 20 of the image transfer device itself performs the enhanced function of "merg[ing] the bitmap with the image data" after the bitmap has been uploaded from the connected computer. (*Id.*, cols. 11:50-12:8). This process is further depicted in Figure 9 of the patent, which is reproduced below:



FIG. 9

(*Id.*, FIG. 9 (illustrating step "T4" as "Device [i.e., the image transfer device] merges bitmap with image read by reader"))

## C. *Inter Partes* Review of the '633 Patent (IPR2016-00723)

On March 8, 2016, Unified Patents Inc. ("Petitioner") petitioned the United States Patent and Trademark Office's Patent Trial and Appeal Board ("PTAB" or "Board") to institute *inter partes* review ("IPR") of every claim (1-26) of the '633 patent. (D.I. 13, ex. A (*Unified Patents Inc. v. Ruby Sands LLC*, No. IPR2016-00723, Paper No. 7 at 2 (P.T.A.B. August 29, 2016)

6

("Institution Decision"))[4] Petitioner asserted five grounds of unpatentability: three grounds for claims 1-18 and 21-26, and two grounds for claims 19 and 20. (*Id.* at 11) The grounds asserted for claims 19 and 20 were anticipation by U.S. Patent No. 5,701,184 ("Motoyama") and anticipation by U.S. Patent No. 7,315,386 ("Shiimori"). (*Id.* at 10-11)

The Board's institution decision found that Petitioner had established a reasonable likelihood of success in proving unpatentability for only one of the unpatentability grounds asserted: obviousness of claims 1-18 and 21-26 over four references. (*Id.* at 40, 54) The Board found that Petitioner had not established a reasonable likelihood of success of proving unpatentability based on the other four proposed grounds, and thus issued a partial institution decision. (*Id.* at 54) *Cf. SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348 (2018) (forbidding this practice two years later).

The Board rejected Petitioner's challenge to claims 19 and 20 based on Motoyama because the Board was not persuaded that Motoyama disclosed the claims' requirement that the processor of the image transfer device must "automatically merg[e]" electronic data with an image read by the device's scanner. (D.I. 13, ex. A at 47-49; *see also id.* at 41-42 (overview of Motoyama)) As for Petitioner's challenge to claims 19 and 20 based on Shiimori, the Board similarly found Petitioner's argument lacking. There, it ruled that Petitioner had impermissibly attempted to combine two separate embodiments disclosed in Shiimori in an attempt to show anticipation by a reference. (*Id.* at 51-53; *see also id.* at 49-50 (overview of Shiimori))

---

[4] Plaintiff included this decision as an attachment to its answering brief to the motions. (*See, e.g.*, D.I. 13, ex. A) At times, Plaintiff incorrectly refers to this decision as "IPR Final Written Decision." (D.I. 13 at 6, 14) On its face, however, this document indicates it was issued pursuant to 37 C.F.R. § 42.108 (regarding institution of *inter partes* review), rather than 35 U.S.C. § 318(a) (regarding final written decisions) and 37 C.F.R. § 42.73 (regarding judgments). (D.I. 13, ex. A at 1 (titled "DECISION Institution of *Inter Partes* Review"))

Subsequently, the Patent Owner requested adverse judgment pursuant to 37 C.F.R.

§ 42.73(b), asking that the Board "cancel claims 1-18 and 21-26." *Unified Patents Inc. v. Ruby Sands LLC*, No. IPR2016-00723, Paper No. 17 (P.T.A.B. December 2, 2016). Thereafter, the Board granted this request. *Unified Patents Inc. v. Ruby Sands LLC*, No. IPR2016-00723, Paper No. 18 (P.T.A.B. January 6, 2017).

## II.    STANDARD OF REVIEW

As noted above, these Rule 12(b)(6) motions are premised on the assertion that the remaining patent claims-in-suit are directed to patent-ineligible subject matter. The Court has often set out the relevant legal standards for review of such a motion, including in *Genedics, LLC v. Meta Co.*, Civil Action No. 17-1062, 2018 WL 3991474, at *2-5 (D. Del. Aug. 21, 2018). The Court hereby incorporates by reference its discussion in *Genedics* of these legal standards. In assessing the motions, the Court will follow this body of law. To the extent consideration of the motions necessitates discussion of other, related legal principles, the Court will set out those principles in Section III below.

## III.    DISCUSSION

In resolving Defendants' motions, the Court will first discuss which claim will be specifically addressed herein as representative. Thereafter, it will analyze the relevant claim under both steps of the test for patent eligibility set out in *Alice Corp. Pty. Ltd. v. CLS Bank International*, 573 U.S. 208 (2014).

### A.    Claims at Issue

In the relevant Complaints, Plaintiff alleges that each Defendant infringes "at least claim 19 of the '633 Patent." (D.I. 1 at ¶ 19; *see also id.* at ¶¶ 21-26, 31-32, 35-36; Civil Action No. 18-1856, D.I. 1; Civil Action No. 18-2072, D.I. 1; Civil Action No. 18-2074, D.I. 1; Civil Action

No. 18-2075, D.I. 1; Civil Action No. 18-2076, D.I. 1) As discussed above, the '633 patent contains only two active claims (claims 19 and 20) after the adverse judgment granted in the IPR. And Defendants have put both claims squarely at issue with their motions, (*see, e.g.*, D.I. 7 at 12), asserting that independent claim 19 is representative for the purposes of the patent eligibility analysis, (*id.* at 7).

In Plaintiff's answering briefs, in explaining why the patent is directed to patent eligible subject matter, Plaintiff made specific reference only to claim 19. (*See generally* D.I. 13) Thus, the Court will treat claim 19 as representative, understanding that Plaintiff's arguments for eligibility as to claims 19 and 20 rise and fall on the arguments it made with regard to claim 19. *See Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365-66 (Fed. Cir. 2018); *TMI Sols. LLC v. Bath & Body Works Direct, Inc.*, C.A. No. 17-965-LPS-CJB, 2018 WL 4660370, at *6 (D. Del. Sept. 28, 2018).

Claim 19 recites:

> **19.** A method for transferring information from a first medium, the method comprising the steps of:
>
> providing an image transfer device having a scanner for reading an image on the first medium;
>
> reading the image on the first medium with the scanner;
>
> automatically uploading electronic data including at least a portion of an image transfer menu to be displayed by the image transfer device to the transfer device from a computer connected to the transfer device;
>
> with a processor of the image transfer device, automatically merging the electronic data with the image read by the scanner; and
>
> transferring the merged image by the transfer device to a second medium.

('633 patent, col. 18:7-19)

**B.    *Alice*'s Step One**

Defendants assert that claim 19 is directed to the abstract idea of "capturing, uploading

and transferring data[.]"  (D.I. 7 at 6; *see also id.* at 9-10)[5]  In response, Plaintiff does not contest

that the concept of "capturing, uploading and transferring data" is an abstract idea.  Instead, it

makes a few different arguments about why, in its view, the claim is not "directed to" such an

idea—i.e., that Defendants' distillation of claim 19 reads out "limiting detail and inventive

concepts[.]"  (D.I. 13 at 8)

The Court agrees with Defendants that the claim is drawn to this abstract idea.  This idea

is a "disembodied concept . . . untethered from any real-world application."  *CLS Bank Int'l v.*

*Alice Corp. Pty. Ltd.*, 717 F.3d 1269, 1286 (Fed. Cir. 2013) (internal quotation marks and

citation omitted); *see also Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332,

1341 (Fed. Cir. 2017) (finding a claim to be directed to the abstract idea of "collecting,

displaying, and manipulating data"); *Content Extraction & Transmission LLC v. Wells Fargo*

*Bank, Nat. Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014) (finding claims "drawn to the abstract

idea of 1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing

that recognized data in a memory").  And the patent provides significant indications that claim

19 is in fact "directed to" this concept.  After all, the specification broadly describes the

invention as being directed to an "image transfer system" comprising "an image transfer device

for reading and transferring an image from a first medium, and a computer." ('633 patent,

---

    [5]     At times, Defendants also suggested the claim was directed to the concept of
"data recognition and transfer[,]" (D.I. 7 at 7), or "[d]ata recognition, upload and transfer[,]" (Tr
at 30).  The Court is not convinced that this is the right formulation of the abstract idea at issue,
however, at least as to claim 19, since the claim does not explicitly use the term "recognition."

Abstract; *see also id.*, Title; *id.*, col. 1:6-10)  The specification also explains that "the present invention can be embodied in many alternate forms of embodiments . . . [and] any suitable size, shape or type of elements or materials could be used."  (*Id.*, col. 3:8-13)  It is also notable that the preamble to claim 19 is broadly worded as a "method for transferring information from a first medium[.]"  ('633 patent, col. 18:7-8); *see Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1340 (Fed. Cir. 2017) (noting that it was not error for the district court to cite "to the preamble in its review of whether the claims are directed to an abstract idea" where the court's inquiry was "centered on determining the 'focus' of the claims").  And Figure 9—a figure that Plaintiff describes as providing a "roadmap" for representative claim 19, (D.I. 13 at 5)—is a flowchart that uses broad, functional language, e.g.: "reader *reads* the image," "device *uploads* bitmap from computer memory," "device merges bitmap with image read by reader," and "merged image is *printed*."  ('633 patent, FIG. 9 (emphasis added))

In attempting to combat Defendants' step one position, Plaintiff makes two primary arguments.  Neither are availing.

First, Plaintiff argues that claim 19 is not directed to an abstract idea because it "improv[es] scanning device interfacing technology by embedding a customized 'image transfer menu' from a computer into scanned image data from the scanning device."  (D.I. 13 at 10-11)[6] To be sure, claim 19 does require that the claimed image transfer device be "automatically uploading electronic data including at least a portion of an image transfer menu" from the connected computer, and then "*automatically merging* the electronic data with the image read by

---

[6]      The Court agrees with Defendants that nothing in the claim requires "embedding" data into an image (the claim instead requires "merging"), nor does the claim require that an image transfer menu be "customized."  (D.I. 17 at 2)  Therefore, the Court will hereafter discuss the claim's "automatically merging" step in the manner in which it is described in claim 19.

the scanner[.]" ('633 patent, col. 18:12-17 (emphasis added)) But the problem with Plaintiff's

argument (as is discussed in more detail in the step two analysis below) is that the patent[7] never

suggests that: (1) claim 19 is directed to the "automatically merging" step, nor (2) that this

"merging" process amounts to an essential aspect of the invention, or an important,

unconventional improvement in the computer arts. Thus, Plaintiff's first step one argument fails.

(D.I. 13 at 1-2, 4, 10-12)[8]

Second, Plaintiff argues that claim 19 "solves another problem plaguing prior art image

transfer devices[,]" in that it "expand[s the] speed and functionality" of such a device by

"transparently (to the user) offloading the increasingly demanding processing and memory

---

[7]     *Cf. Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed. Cir. 2016)
(indicating that it is appropriate to look to a patent's specification to determine whether a claim
of the patent is "directed to" a particular concept, and that if a claim contains a particular element
that is described by the patent's specification as what the "present invention comprises[,]" this
suggests that the claim is directed to that element or concept) (internal quotation marks and
citation omitted); *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1348 (Fed. Cir.
2015) (same, and noting that if a concept is described in the patent as being "the innovation over
the prior art" or the "the essential, most important aspect" of the patented invention, that suggests
that the claim is directed to that concept) (internal quotation marks and citation omitted).

[8]     In its supplemental letter brief, Plaintiff had argued that the presence of the
"automatically merging" element in claim 19 made this case similar to that in *Core Wireless
Licensing S.A.R.L. v. LG Electronics, Inc.*, 880 F.3d 1356 (Fed. Cir. 2018). (D.I. 22 at 2)
However, even a quick read of *Core Wireless* demonstrates why that case is different from this
one. In *Core Wireless*, the Federal Circuit held the claims at issue to be patent eligible at *Alice*
step one because they were "directed to an improved user interface for computing devices" and
"recite[d] a specific improvement over prior systems, resulting in an improved user interface for
electronic devices." 880 F.3d at 1362-63. But there, the Federal Circuit's decision was premised
in significant part on the fact that the patent-in-suit's specification "confirm[ed]" that the claims
described an improvement to prior art user interfaces—such as when the specification described
how the prior art interfaces had "many deficits" relating to efficient functionality, which the
claimed technology had improved upon. *Id.* at 1363. Here, the '633 patent does not describe any
"deficits" with user interfaces in prior art systems that claim 19's "automatically merging" step is
meant to solve. (Tr. at 75-76) Indeed, it is notable that although Plaintiff referenced *Core
Wireless* in its supplemental letter brief, the case went unmentioned in Plaintiff's previously-filed
(and lengthier) answering brief. (D.I. 13)

12

requirements of [the device] onto a removably connected computer." (D.I. 13 at 10; *see also id.* at 2-4) Unlike with Plaintiff's first argument, there *are* plenty of instances in the specification where the patentee touts the invention's use of a "removably connected computer" to boost the "speed and functionality" of the claimed assemblies/methods, describing this as an important contribution to the art. (*See* '633 patent, cols. 1:21-31 ("One object of the present invention is to provide a software and user interface [] solution for enriching personal and desktop copier feature sets by utilizing the processing power and memory capacity of a connected personal computer."); *see also id.*, cols. 14:1-11, 14:42-48, 15:20-41) However, this fact does not inure to Plaintiff's benefit in the step one analysis. Most significantly, that is because it is well settled that "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice*, 573 U.S. at 223. Thus, even if claim 19 was directed to this feature (i.e., due to the claim's utilization of the connected computer to store certain electronic data that is uploaded to the image transfer device), that would just mean that the basic character of the claim was still drawn to an abstract idea—i.e., using a generic computer, performing its most basic functions (i.e., using "processing" power and "memory"), to aid in the implementation of "capturing, uploading and transferring data."

For all of these reasons, the Court agrees with Defendants that, at step one, claim 19 is directed to an abstract idea.

## C.    *Alice*'s Step Two

At step two, the Court must ask if the claim's elements, either considered individually or taken together, recite an "inventive concept" that amounts to significantly more than the abstract idea itself. *Alice*, 573 U.S. at 217 (internal quotation marks and citation omitted). And in doing so, the Court must be mindful that if a claim's only alleged inventive concept involves the

13

application of the abstract idea using "conventional and well-understood techniques[,]" then the claim has not been transformed into a patent-eligible application of an abstract idea. *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1316 (Fed. Cir. 2019) (internal quotation marks and citation omitted).

Defendants argue that claim 19 fails this step two test. They assert that the claim simply discloses the abstract idea along with a number of generic computer components, and that the claim is written in broad, functional language that does not describe how its features are to be implemented. (D.I. 7 at 12-14) For example, Defendants note (and Plaintiff does not really dispute) that the physical components referenced in the claim (i.e., "image transfer device,"[9] "computer," "scanner," and "processor") and their claimed arrangement ("computer connected to the transfer device") are all "generic" and "conventional." (*See* D.I. 7 at 3-4, 13; D.I. 17 at 9-10; *see also* '633 patent, cols. 3:14-23, 3:42-43, 4:4-6, 12:18-25) Additionally, Defendants argue that each of the steps of the claim is described "only at a high level of generality" (i.e., "providing an image transfer device[,]" "automatically uploading electronic data[,]" "automatically merging the electronic data with the image[,]" "transferring the merged image"). (*Id.*, col. 18:9-19) Indeed, these are all good indicators that the claim may fail *Alice* step two.

In an attempt to rebut this showing, Plaintiff asserts that two previously-referenced, allegedly-"core" inventive features rescue the claim:

- "[E]mbedding a customized 'image transfer menu' from a computer into scanned image data from the scanning device"

---

[9]     The specification explains that "the image transfer device may include a computer printer, a copier, a facsimile or an optical scanner capability." ('633 patent, col. 3:53-54).

- "[T]ransparently (to the user) offloading the increasingly demanding processing and memory requirements of image transfer devices onto a removably connected computer[.]"

(D.I. 13 at 12; *see also* D.I. 22 at 2) Below, the Court will assess both arguments as part of its step two review.

### 1. Automatically Merging the Electronic Data (Including at Least a Portion of an Image Transfer Menu) With the Scanned Image

Plaintiff's first argument is the more promising of the two. Claim 19's "automatically merging" step, as articulated by Plaintiff, does seem to bring with it at least a modicum of particularity. ('633 patent, col. 18:12-18) But for the reasons set out below, this argument is not (at least for now) a winning one.

A first step here is to figure out what this language in claim 19 actually requires. For example, when the claim speaks to "automatically merging the electronic data with the image read by the scanner[,]" does that mean that the claim is also requiring that the "portion of an image transfer menu"[10] (which is required to be a part of the downloaded "electronic data") must itself be merged with the scanned image? And what does it mean to "merg[e]" these two data types? At oral argument, the Court repeatedly asked Plaintiff's counsel to explain. (Tr. at 37-50, 59)

In doing so, Plaintiff's counsel appeared to suggest that the claim requires merging the uploaded portion of an image transfer menu with the scanned image. (*Id.*) And counsel suggested that the Complaint's infringement allegations were instructive, in that they allege that

---

[10]     The Court, for purposes of resolving this Motion, will adopt Plaintiff's suggested construction for "image transfer menu" (the same construction adopted by the PTAB), which is "a list, displayed on a screen of a first computing device, of available functions selectable by a user, including a function that necessitates either one or both of transmitting image data and receiving image data." (D.I. 22 at 1 (internal quotation marks and citation omitted); Tr. at 38-39)

the accused product automatically merges a scanned copy of a paper receipt (e.g., the scanned "image") with a menu option that offers the option to deposit that receipt (e.g., the "portion of an image transfer menu"). (*Id.* at 42-47 (citing D.I. 1 at 8-10)) Additionally, Plaintiff's counsel, citing to the patent, suggested that in other embodiments, the requisite "image transfer menu" could be a "bitmap."[11] (*Id.* at 47-49, 59) And it also eventually became clear that Plaintiff's allegation is that a device can "merg[e]" a scanned image and an image transfer menu/bitmap by, *inter alia*, simply superimposing the menu/bitmap on top of the scanned image. (*Id.* at 50, 60, 67)

With that understood, the question becomes: Does this claimed feature amount to something more than the application of the abstract idea using "conventional and well-understood techniques"? The difficulty here for Plaintiff (as was noted above in the step one analysis) is that there is nothing in the patent that says—or even hints—that it does. *Cf. Berkheimer*, 881 F.3d at 1369 (finding that summary judgment was improper at *Alice* step two because there was a factual dispute as to whether the claimed improvement was well-understood

---

[11]     Examples of a "bitmap" that are described in the '633 patent include "time and date stamps, fixed messages, logos or watermarks[.]" ('633 patent, col. 11:44-47; *see also id.*, col. 14:48-49). Defendants do not agree that a "bitmap" can amount to a "portion of image transfer menu" or an "image transfer menu." (D.I. 17 at 3-4) As to that issue, it does seem a bit hard to see how a bitmap (which can simply be a logo or watermark) would necessarily meet Plaintiff's proposed definition of an "image transfer menu" discussed above (which requires a "list . . . of available functions selectable by a user"). *See supra* n.10. And, as Defendants point out, (D.I. 17 at 4), the specification: (1) at times uses phraseology that could be read to suggest that a "bitmap" and a "menu feature" associated with such a bitmap are two different things; and (2) never explicitly equates a bitmap with an "image transfer menu." (*See* '633 patent, col. 14:48-50) Nevertheless, for purposes of resolving the Motion, the Court will assume that a bitmap can be a portion of an image transfer menu. *See Content Extraction*, 776 F.3d at 1349 (reviewing an eligibility decision at the pleading stage and adopting a construction most favorable to the patentee (even one where there was some question as to the construction's merit), before going on to assess whether, even in light of that construction, the claims could survive the *Alice* analysis).

16

and conventional, and where the specification itself "explain[ed] that the claimed improvement increases efficiency and computer functionality over the prior art systems" and "describe[d] an inventive feature that stores parsed data in a purportedly unconventional manner."); (D.I. 20 at 1-2; Tr. at 53-54 (Plaintiff's counsel acknowledging that nothing in the patent suggests that merging electronic data with a scanned image was unconventional)). In fact, there is not very much in the patent that even discusses this "merging" process at all. Plaintiff does point to at least one portion of the specification (in column 12) where the concept of automatically merging a bitmap with downloaded image data (in a manner that might be akin to what is described in claim 19) is briefly addressed.[12] ('633 patent, col. 12:3-11 ("CPU **20** . . . merges the bitmap with the image data from the reader **18** of the device **12** such that the image . . . includes the message 'Confidential Document' in the desired location."); *see also id.*, FIG. 9 ("device merges bitmap with image read by reader"); D.I. 13 at 5) But that short description provides little detail as to how such a "merge" is accomplished. And, more importantly, it includes no indication that such a process amounts to the unconventional use of computer technology to solve a problem in the computer arts. (Tr. at 78)

The best way for Plaintiff to deal with this void in the record as to unconventionality—if there really was a case to be made that, at the relevant time, merging an image transfer menu/bitmap with a scanned image amounted to more than the use of "conventional and well-understood techniques"—would be for Plaintiff to add such factual allegations into the operative

---

[12]     Plaintiff also suggested that this "automatically merging" step was discussed in column 13 of the patent. (D.I. 13 at 6 (quoting '633 patent, col. 13:56-67); *see also id.* at 13; Tr. at 62) But that discussion is directed to an alternative embodiment that requires the connected "computer processor **32**C" to perform the merge, rather than the "processor of the image transfer device," as is recited in claim 19. (*Compare* '633 patent, col. 13:56-67, *with id.*, col. 18:15-17; *see also* Tr. at 56)

complaint. But for whatever reason, Plaintiff did not do that. The operative Complaints here do not provide "plausible and specific factual allegations" on this topic that describe how and why the allegedly-inventive "automatically merging" step was unconventional in the art. *See Cellspin*, 927 F.3d at 1317-18. All the Complaints do is note the presence of the "automatically merging" step in claim 19 and then make a (brief) fact-based argument about why the accused products practice that step. (D.I. 1 at ¶¶ 12, 17)

Therefore, on this record, the Court finds this first alleged "inventive feature" is insufficient to help the claim survive *Alice* step two. *See TriPlay, Inc. v. WhatsApp Inc.*, C.A. No. 13-1703-LPS-CJB, 2018 WL 1479027, at *8 (D. Del. Mar. 27, 2018) (noting that "[u]nlike . . . the claims involved in *Ber[k]heimer*, the specification here is silent as to what the specific claimed improvement is, how it differs from the prior art, or how any inventive feature, alone or as an ordered combination, is used in an unconventional manner" and that "this gap in the specification is not filled by [plaintiff's] pleadings"), *aff'd*, 771 F. App'x 492 (Fed. Cir. 2019).

### 2. Offloading Demanding Processing and Memory Requirements Onto a Removably Connected Computer

The second inventive feature emphasized by Plaintiff in its step two analysis is "transparently (to the user) offloading the increasingly demanding processing and memory requirements of image transfer devices onto a removably connected computer." (D.I. 13 at 12) However, as was noted above in the step one analysis, the only place in claim 19 where the connected computer plays any role is when the image transfer device automatically uploads "electronic data including at least a portion of an image transfer menu" from the connected computer. ('633 patent, col. 18:12-15; *see also* Tr. at 8, 10) And this step, which merely uses an attached computer for its most basic, generic function (i.e., storing data that is then uploaded),

18

could not itself provide the necessary inventive concept. *Alice*, 573 U.S. at 223; *TLI*, 823 F.3d at 614 (citing cases).[13]

Thus, this second "inventive concept" argument is a non-starter for Plaintiff.

## D. Dismissal With or Without Prejudice?

Defendants request that the motions be granted with prejudice, arguing that further attempts at amendment would be futile. (D.I. 7 at 15; D.I. 17 at 10) Plaintiff's responsive briefing did not address this issue. (*See generally* D.I. 13) However, at oral argument, Plaintiff asserted that it could supplement its pleading to include factual allegations regarding the benefits and unconventionality of the "automatically merging" limitation, in a manner sufficient to withstand a further motion to dismiss. (Tr. at 63-64 (Plaintiff's counsel suggesting that it could "absolutely" amend its complaint to include credible allegations that "at the time of the filing of the patent, . . . it was unconventional to merge a portion of an image transfer menu with a[ scanned] image in the way described in claim 19, and that [this] solved a problem [in the] computer arts"); *see id.* at 67-68)

In light of Plaintiff's request and the Court's analysis set out above, and because the Court cannot definitively say at this time that further amendment would be absolutely futile, the

---

[13]     In its answering brief, Plaintiff fleetingly suggested that claim construction is necessary before the Court can resolve the parties' Section 101 arguments. (D.I. 13 at 15) But Plaintiff's assertion there was entirely conclusory, in that it provided no indication of how or why claim construction would make a difference. (*Id.*); *see also CyberFone Sys., LLC v. Cellco P'ship*, 885 F. Supp. 2d 710, 715 (D. Del. 2012). Above, where the Court has discerned that a claim construction issue might have an impact on resolution of this Motion, the Court has adopted Plaintiff's proposed constructions if they were at all plausible. To the extent that Plaintiff hereafter seeks to further amend its Complaint, and to the extent this Section 101 issue is again raised at the pleading stage, Plaintiff will need to better articulate how or why claim construction would make a difference.

Court recommends that dismissal be without prejudice.[14]  This is particularly true in light of the recent guidance from the Federal Circuit that "the specification need not expressly list all the reasons why [the] claimed [feature] is unconventional[,]" so long as the feature is recited in the claims and the unconventionality and benefits are properly alleged in the complaint.  *Cellspin*, 927 F.3d at 1317-18; *cf. TrackTime, LLC v. Amazon.com, Inc.*, C.A. No. 18-1518 (MN), 2019 WL 2524779, at *6 n.1 (D. Del. June 19, 2019) (allowing plaintiff leave to amend its complaint to "include additional allegations regarding step 2 of *Alice*" in spite of defendants' objections that any amendment would be futile).  Therefore, this Court recommends that the motions be granted without prejudice to Plaintiff getting one final opportunity to amend, in order to address this Section 101-related issue.

## IV.    CONCLUSION

For all of these reasons, the Court recommends that the District Court GRANT Defendants' motions without prejudice.  The Court also recommends that, if this recommendation is adopted, Plaintiff be granted 30 days to amend its Complaints or face dismissal of this action.

---

[14]    Plaintiff suggested that, among other things, such amendment might better address the relevance to Section 101 issues of the PTAB's conclusion that claim 19 was not anticipated by two prior art references.  (Tr. at 63-64)  To the extent that the PTAB's decision regarding anticipation (i.e., novelty over particular pieces of prior art) is even relevant to the step two inquiry, *cf. Realtime Adaptive Streaming LLC v. Haivision Network Video Inc.*, Civil Action No. 17-cv-1520-CFC-SRF, 2018 WL 6532925, at *9 (D. Del. Dec. 12, 2018), Plaintiff would have to address how the PTAB's decision is edifying on the eligibility question (regarding the issue of pre-emption or otherwise).  After all, the PTAB's decision does *not* show that the prior art failed to disclose "merging."  Instead, as discussed above, the PTAB found that the petitioner failed to show that the prior art disclosed merging "without user interaction" (i.e., "automatically") or merging specifically with the "image read by the scanner." (*See* D.I. 13, ex. A at 47-53).

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court. *See Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Dated: August 14, 2019

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE